John L. Smaha, Esq.  (Bar No. 95855)
Gustavo E. Bravo, Esq. (Bar No. 218752)
SMAHA LAW GROUP
2398 San Diego Avenue
San Diego, CA  92110
(619) 688-1557
(619) 688-1558 (Facsimile)

Proposed Attorneys for Debtor, Posiba, Inc.

**UNITED STATES BANKRUPTCY COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| In re<br><br>POSIBA, INC. | CASE NO.  16-07714-MM11<br><br>Chapter 11<br><br>DEBTOR'S SUPPLEMENTAL MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS *EMERGENCY/FIRST DAY MOTION BY DEBTOR FOR AN ORDER AUTHORIZING DEBTOR TO PAY PRE-PETITION NON-INSIDER PAYROLL*<br><br>DATE:     January 17, 2017<br>TIME:      3:00 pm<br>JUDGE:   Hon. Margaret M. Mann<br>DEPT.:    One |

Debtor hereby submits this Supplemental Memorandum of Points and Authorities in Support of its *Emergency/First Day Motion by Debtor for an Order Authorizing Debtor to Pay Pre-Petition Non-Insider Payroll* filed on January 4, 2017.  An Objection was filed to this Motion by Creditor, Keshif Ventures, LLC ("Keshif").  At the on January 9, 2017 hearing on the Motion, the Court requested additional information. This brief and the concurrently filed Declaration of Elizabeth Dreicer are intended to respond to the Objection and to provide the Court with the facts necessary to grant the Motion.  In addition, this supplemental brief seeks to clarify the nature of its post-petition financing as within the ordinary course of business or to seek relief under 11 U.S.C. § 364(b).

1

## I. INTRODUCTION

In its objection, Creditor, Keshif Ventures, LLC ("Keshif") makes the following claims or assertions:

1. There is no emergency;
2. There are no ongoing operations of the Debtor; and
3. The financing is not necessary to preserve the value of an ongoing business, and should be not incurred as an administrative expense.

As will be set forth in detail below, these and other misrepresentations and assertions about the Debtor and the state of its business are false. Rather, the Debtor's operations are ongoing. However, those operations are under the imminent threat of ceasing if the Court does not permit Debtor to pay pre-petition payroll to its employees. As such, the financing is critical to preserve value of Debtor's ongoing business, both for Debtor's stakeholders and to provide Debtor time to reorganize its operations.

## II. FACTUAL SUMMARY AND PROCEDURAL POSTURE

### A. Debtor's Business, And The Need To File For Bankruptcy Protection

Debtor is a utility scale start-up information service company for the social sector. Debtor provides specialized Software as a Service ("SaaS") technology as party of a cloud based "big data" analytics-powered knowledge commons for mostly charitable public and private enterprises. Declaration of Elizabeth Dreicer ("Dreicer Decl.") at ¶2. At this time Debtor is in the advanced development stages of its software platform. *Id.* Pre-petition, Debtor primarily funded operations with investor equity ($8.8M) and investor debt ($3.5M). *Id*. The last stock purchase in May 2016 estimated Debtor's value at approximately $30,000,000 post money. Dreicer Decl. at ¶ 3. On December 22, 2016, the Debtor filed a petition for relief in this Court (the "Petition Date"). Dreicer Decl. at ¶ 4. The Petition was filed because Keshif Ventures, LLC ("Keshif") would not postpone a purported foreclosure on Debtor's assets, despite the fact that it asserted that it was only owed $ 2.15 million. Dreicer Decl. at ¶ 6.

The primary reason Debtor filed for Bankruptcy was to preserve the going concern value and **ongoing operations** of the Debtor's business. Dreicer Decl. at ¶11. Because of an impending foreclosure by Keshif, an insider, the Debtor needs the protections and time under Chapter 11 to focus on the core business operations around which the Debtor's march toward profitability will be based. *Id.* At the time the Debtor sought Chapter 11 bankruptcy protection, it had $5,800,000 open in its Series B round funding and was in active discussions with a number of brand name investors. Dreicer Decl. at ¶ 5. This fact was reported to the Board and Keshif's Taner Halicioglu in his Board observation role and as lead investor. *Id.* At that time, one of these investors had just advised us of their interest in investing, while also articulating the need to bring in another high quality Venture Capital Lead and they started to make introductions for this purpose. *Id.*

On January 4, 2017, Debtor filed a First Day Motion for An Order Authorizing Debtor to Pay Pre-Petition Non-Insider Payroll ("Motion"). Dreicer Decl. at ¶ 7. The Motion stated that the services provided by Debtor's non-insider employees are essential to the smooth, efficient operation of the Debtor's business, and prompt development and presentation of a plan of reorganization, including those employees employed by the Debtor's wholly-owned subsidiary in Vietnam. *Id.* As such, Debtor sought the Court's approval to pay these employees the wages and benefits which were due within 180 days of the Petition. *Id.* Debtor requested authorization to pay sums which do not exceed the limits on priority claims provided by 11 U.S.C. §§507(a)(4) and (5) of $12,850 per employee. On January 6, 2017, Keshif objected to the Motion (Dkt. No. 18). On January 9, 2017, the Court issued a tentative ruling and held a hearing on the same day. The Court stated that Debtor must address the assertion made by Keshif that Debtor's operations ceased prior to the Petition date, thus obviating the need for an order permitting the payment of payroll at this time.

### III. KESHIF'S OBJECTION HAS NO MERIT

#### A. Debtor Has Continued Its Operations Since its Inception

The Debtor has maintained operations with no break and the majority of employees have unexpired employment contracts. Dreicer Decl. at ¶ 10. Immediately pre-petition,

Debtor was being funded by its management and staff. *Id.* at ¶ 17. Many key staff have continued to provide serviced on a deferred compensation basis. Dreicer Decl. at ¶10. The primary thrust of the continuous operations is to meet certain initial deliveries under a confidential "Master Subscription and Collaboration Agreement" with Debtor's largest customer, a consortium of charitable foundations and institutions ("Customer"). *Id.* at ¶12.

Under this Agreement, Debtor has the potential to receive an estimated $25,000,000 in revenue over the next five years, $3,000,000 of which Debtor would receive in the next twelve months, if it meets its deliverable schedules. *Id.* These funds will come from subscription grants to Customer's members, some of which will be funded by Customer's Grant Pool. *Id.* Keshif is already familiar with this Agreement. *Id.* Customer may lawfully terminate the Agreement "if the other party becomes insolvent or fails to pay its obligations as they arise." Dreicer Decl. at ¶ 13. At this time, Customer has not terminated the Agreement but is requiring Debtor to resolve its outstanding employee pay issues in order to continue the Agreement. *Id.* at ¶13, FN 2. Therefore, it is essential that debtor be authorized to obtain financing and pay its pre-petition payroll obligations and prepare its plan of reorganization. *Id.* at ¶ 13.

### B. **Debtor Has A Complicated Relationship With Keshif Ventures, LLC, which seeks to acquire the Debtor's Assets**

Keshif invested approximately $5,000,000 in Debtor from inception through May 2016. While Keshif was a small investor in Debtor's Series A round, it emerged as the dominant investor in our Series B. Dreicer Decl. at ¶ 27. Keshif also guaranteed a $1,500,000 Silicon Valley Bank ("SVB") line of credit in the third and fourth quarters of 2015. *Id.* at ¶28. As of the second quarter of 2016, Keshif and the Debtor agreed to renew the line of credit for an additional year. *Id.* In April 2016, Debtor entered into the 5-year, $25,000,000 revenue deal with Customer, who then began collecting funds from its members under the Agreement. *Id.*

Debtor has also worked with Keshif to pursue other investors. Dreicer Decl. at ¶ 29. John Evey, Debtor's Vice President of Capital Development and a Board member, had presented numerous 7 figure investors to Debtor. *Id.* Mr. Evey was also during this time paid

by Debtor at its top salary level of $250,000 per year at a 50% level of effort. *Id.* These representations led the Debtor to believe that new capital was at hand. *Id.* In May 2016, Debtor discovered that many of these investors were merely CEO candidates staged as investors, rather than the substantial money investors that Debtor was promised. *Id.* at ¶30. The relationship between Debtor and its top two investors—Keshif Ventures and The Welborn Family Trust—became strained as a result of Customer payment delays, coupled with overall capital development delays, which put a greater burden on them, and particularly Keshif. *Id.* at ¶32. Debtor also became aware that a substantial relationship existed between Mr. Keshif and Mr. Evey, whereby they are co-invested in at least 25 other companies. *Id.* Mr. Evey is paid by many of those companies to bring in capital (i.e., acting as an investment banker), and the capital he was bringing included Keshif, for which he was getting some payment (5% or some other variable rate) in cash or stock. *Id.*

In early June 2016, Keshif offered to provide a $500,000 bridge "Demand Loan" that was needed for Debtor's ongoing operations and to make payroll. Dreicer Decl. at ¶33. However, it demanded certain "strings" on the proposed financing, including operational, equity and Board changes. *Id.* Discussions at the time suggested that the Demand Loan would convert to equity or a reasonable term Note once additional capital was also secured. *Id.* As it turned out, the Demand Loan was not modified in a suitable way and has acted to freeze out other Angels – the only capital that could actually come in under the tight timeline required as no new investor wanted to invest in a startup with a Demand Loan of this nature. *Id.* Debtor communicated its concerns clearly to Keshif and urged it to adjust this stance. *Id.*

Keshif advised Debtor that it would adjust the demands provided Debtor brought in other qualified investors. Dreicer Decl. at ¶34. However, it rejected all Angel investors Debtor brought to the table because of the universal demand by those investors for the investor debt (including his Demand Loan) to be converted to equity. *Id.* At the same time, the Debtor was now working with an investment banker to pursue large investors or buyers to realign the investors or owners to better suit its market and customers—realizing the need for investors

who understand the customer type and sales cycles, and are overall seasoned in both enterprise and utility scale investment. *Id.*

In mid-June 2016, Keshif and the Debtor's principals met to review proposed changes to the Demand Loan. Dreicer Decl. at ¶ 35. Keshif verbalized agreement and a recognition that an additional $1,500,000 of capital was needed to bridge the Debtor until product delivery (slated at that time for 9/30/2016) and customer revenue—which was expected to begin in the fourth quarter 2016. *Id.* As the line of credit was due in August, discussions about a renewal or potential buy out (by Keshif) were part of the discussion. *Id.* In August 2016, Keshif and its lawyer demanded a very cumbersome securitization of the original $500,000 Demand Note and stipulated that this was a condition to resolving the SVB line of credit in a way that would support the Debtor. Dreicer Decl. at ¶ 36. Despite reservations, Debtor proceeded in good faith to execute the $500,000 Demand Loan. *Id.* at ¶ 37.

The Debtor's management thereafter attempted to work with Keshif on obtaining additional financing as the Debtor worked toward its client development and revenue goals. *Id.* In fact, Keshif had consistently demanded this of Debtor. However, as predicted, the Demand Loan presented a major obstacle to further investments by Angels or extensions of credit by various individuals and entities. *Id.* Debtor has communicated with many of those many of those individuals and entities and the Demand Loan and Keshif continued to be a hurdle to their financial commitments. *Id.* Although Keshif was are of this, and the hardship it was causing to Debtor, it refused to modify the debt. *Id.*

At the same time, Keshif chose not to support the renewal or purchase the SVB line of credit and instead allowed the loan to slip into foreclosure. Dreicer Decl. at ¶ 38. In early October 2016, Keshif elected to buy out the SVB LOC (presumably as required by its guarantee) with the express understanding that it would then begin to work toward a reasonable forbearance agreement with the Debtor. *Id.* at ¶ 39. In late October 2016, Keshif finally gave the Debtor a draft forbearance document with terms that would again not inspire any other rationale investor to fund Debtor. *Id.* at ¶ 39. As such, management and the Board sought a revised forbearance designed to enable other high quality investors to come in and provide the

capital needed. *Id.* Thereafter, in a surprise asset grab maneuver, Keshif did an about-face and, contrary to its assertions to Debtor and its Board that he was trying to help Debtor succeed, Keshif sought to foreclose on the Debtors assets. *Id.* at ¶ 40.

### C. Terms of the proposed unsecured DIP financing

The material terms of the proposed unsecured loan transaction are as follows:

1. A unsecured loan in the amount of $500,000.00 under a Unsecured Note (or notes, as discussed below), a form of which is attached to the Decl. of Dreicer as Exhibit A and which is specifically executed in reliance of 11 U.S.C. § 364(b) as an extension of credit in the ordinary course;

2. Monthly interest only payments at the rate of 8.00% per annum and 2.00% above 30-day LIBOR, whichever is greater (*Id*. at ¶ 1.1); and

3. Maturity date of December 31, 2017 or upon entry of a final order of the Bankruptcy Court confirming a Plan or closing out the case, or upon an Event of Default as defined in the Debtor-in-Possession Financing and Agreement documents attached to the Unsecured Note (*Id*. at ¶ 1.2).

Although not required as the ordinary-course financing at issue in this motion does not require express authorization, the Debtor has also prepared the checklist provided in Appendix D2 of the Local Bankruptcy Rules. There are no issues, as delineated in the Local Rules, which warrant further review of the financing as none of the categories associated with priming financing are applicable to the type of financing sought by Debtor to be approved in its Motion.

### D. Debtor's employees are necessary for ongoing operations

The Debtor's employees are necessary for the ongoing development of Debtor's software and their services are essential to the smooth efficient operation of the Debtor's business. Dreicer Decl. at ¶7. Indeed, the Debtor cannot operate its business without them. *Id.* at ¶20. Importantly, continued development of Debtor's software is essential to the prompt development and presentation of a plan of reorganization. *Id.* at ¶7. Specifically, the Debtor needs its employees to continue its ongoing operations, including finalizing its software platform that it may be rolled out to customers. *Id.* at ¶22. These essential employees include

individuals employed by the Debtor's wholly-owned subsidiary in Vietnam (Posiba Vietnam, Ltd.)  *Id.* at ¶7.

All of the essential, non-insider employees rely upon the regular receipt of their paychecks.  Paying these wages at this time is crucial to preserving the going concern value of the Debtor's operation, as well as its ability to promptly proceed with the process of reorganization.  Additionally, because of the laws of Vietnam, none of the employees may work upon expiration of their contracts so long as there are unpaid wages.  While some employees continue to work in Vietnam under current contracts, those will soon expire and they will cease working if they are not paid in full.  These Vietnamese employees are critical to the Debtor's software platform's development and, without them, the Debtor will not be able to meet its short and medium-term goals which are essential to a successful reorganization.

### III. LEGAL STANDARDS

#### A. The framework of 11 U.S.C. § 364 is meant to incentivize lending.

11 U.S.C. § 364 "governs all obtaining of credit and incurring of debt by the estate." H.R. Rep. No. 595, 95th Cong., 1st Sess. 346 (1977); S. Rep. No. 989, 95th Cong., 2d Sess. 57 (1978). It contains a progressive hierarchy of inducements to prospective lenders which are designed to overcome their natural reluctance to lend money to a company in bankruptcy.  The most basic inducement is found in subsections (a) and (b) of Section 364, which permit a trustee or DIP to obtain unsecured credit or incur unsecured debt allowable under 11 U.SC. § 503(b)(1) as a second-priority administrative expense.  11 U.S.C. § 364(a) and (b).  Section 364(c) permits the granting of a superpriority or liens if unsecured credit cannot be obtained solely on the promise of an administrative priority, and Section 364(d) authorizes a priming lien if credit is otherwise unavailable and the primed secured creditor is given adequate protection.

For both 11 U.S.C. § 364(a) and (b), the credit extension must be authorized; the difference is in whether that authorization is obtained expressly (11 U.S.C. § 364(b)) or by implication (11 U.S.C. § 364(a)).  Implied authorization arises under Section 364(a) if: (1) the trustee or DIP is authorized to operate the business (it is); and (2) the credit or debt is obtained

1 or incurred "in the ordinary course of business" (it is).  See *In re Dant & Russell, In*c. (9th Cir. 1988) 853 F2d 700, 704, fns. 4 & 5.  In such a case, further court approval of the credit transaction is not required as the authorization to obtain the financing is implied.  *In re Mr. Gatti's, Inc*. (Bankr. W.D. Tex 1994) 164 B.R. 929.

**B.  This Court may authorize DIP financing on the emergency basis.**

Rule 4001(c) of the Federal Rules of Bankruptcy Procedure govern the procedure regarding credit extensions.  Subsection 2 of that Rule authorizes an interim emergency hearing.  Motions seeking post-petition financing under Rule 4001(b) or (c) are specifically permitted as First Day Motions under Appendix D1 of the Local Bankruptcy Rules.  If this Court makes a determination that Section 364(a) does not apply because the extension of credit is outside the ordinary course of business for the Debtor, court approval of the credit transaction is otherwise required under Section 364(b).

**C.  This Court is authorized to grant the requested relief.**

Under Bankruptcy Code §105(a), the Court is authorized to enter "any order, process or judgment that is necessary or appropriate to carry out the provisions of the Bankruptcy Code.  A general practice has developed where bankruptcy courts permit the payment of certain pre-petition claims, pursuant to §105, where the debtor will be unable to reorganize without such payment.  For example, courts often permit the payments of pre-petition wages so that the debtor-in-possession may maintain an effective work force, especially where the amount of the payment is relatively small and where it appears that the wages being paid would ultimately qualify as priority claims. *In re Quality Interiors* (Bankr. N.D. Ohio 1991) 127 B.R. 391, 396. In this case, the loan is with the bankruptcy estate; and directly and substantially benefits the estate and all of its creditors, including Keshif.  *In re Azevedo* (Bankr. D. ID 2013) 485 BR 596, 602.

A trustee or debtor-in-possession authorized to operate the debtor's business under 11 U.S.C. § 1108 may need to borrow money or obtain credit in order to preserve the estate or to further the debtor's rehabilitation efforts. The need for an infusion of additional working capital is usually prompted by the debtor's financial plight which triggered the bankruptcy. The

1  DIP has few other feasible avenues to obtain working capital: its ability to use cash collateral is
2  restricted under Section 363(c); a prepetition loan agreement may not be assumed under
3  Section 365(c)(2); and trade creditors cannot be compelled to ship goods on credit. See 11
4  U.S.C. § 365(c)(2); *see also In re Sun Runner Marine, Inc.* (9th Cir. 1991) 945 F.2d 1089).

5  Thus, obtaining financing is normally one of the first matters that a DIP must pursue
6  once in bankruptcy.  The purpose of post-petition DIP financing is to facilitate reorganizations
7  when credit might not be readily available: "(T)he best opportunity for a business to reorganize
8  occurs when post-petition suppliers of goods and services do not demand immediate payment.
9  Such suppliers are highly unlikely to extend credit to an entity in bankruptcy unless they are
10 granted priority of payment over prepetition unsecured creditors." *In re Massetti* (Bankr. E.D.
11 Pa. 1989) 95 BR 360, 363.  The same is true, if not more important, when capital is needed to
12 pay for more of a company's more vital assets -- its employees, who depend upon regular and
13 prompt payment of their wages. *In re Gulf Air*, (Bankr. W.D.La. 1989) 112 B.R. 152.  Indeed,
14 under Bankruptcy Code §507(a)(4)(A), wages, salaries and bonuses, including vacation pay,
15 earned by employees within 180 days before the petition date (up to $12,850 per employee) are
16 entitled to priority.  Courts regularly find that payment of pre-petition wage and benefit
17 obligations is in the best interests of creditors and necessary for the successful reorganization
18 of the Chapter 11 debtor.  See *Id*.

19 Section 364(a) and (b) specifically incorporate the requirements imposed by Section
20 503(b)(1), the credit or debt must be extended for the actual and necessary costs of preserving
21 the estate.  11 U.S.C. § 503(b)(1)(A). In short, the credit must be used for a proper purpose and
22 benefit to the estate must be shown to support administrative priority.  11 USC § 364(b); *In re*
23 *Club Develop. & Mgmt. Corp*. (9th Cir. BAP 1982) 27 BR 610, 611; *In re Sherwood Square*
24 *Assocs*. (BC D MD 1989) 107 BR 872, 875.

25 \\
26 \\
27 \\
28 \\

10

SUPPLEMENTAL MEMORANDUM OF POINTS AND AUTHORITIES ISO EMERGENCY/FIRST DAY
MOTION FOR AN ORDER AUTHORIZING DEBTOR TO PAY PRE-PETITION NON-INSIDER PAYROLL

## IV. ARGUMENT

### A. <u>Debtor is entitled to the relief it has requested.</u>

#### 1. Debtor has obtained credit in the ordinary course of business, which it relied upon to operate and preserve the estate

The debtor in possession ("DIP") has substantially all of the powers of a trustee. 11 USC §§ 1107, 1108. That general authorization to operate the business carries with it the implicit authority to conduct ordinary course activities incident to that business operation. Courts use two tests to determine if a disputed transaction arose in the ordinary course of business: the "vertical dimension" test and the "horizontal dimension" test. The vertical dimension test focuses on the creditor's expectations, examining the transaction from the standpoint of a hypothetical creditor's reasonable expectations regarding the transactions that the debtor is likely to enter in order to successfully run its business. *In re Blumer* (B.A.P. 9th Cir. 1988) 95 B.R. 143, 148; *In re James A. Phillips, Inc.* (S.D. N.Y. 1983) 29 B.R. 391, 394. Courts look to the nature of the particular debtor's prepetition business as compared to its post-petition operations and conduct. *In re Dant & Russell, Inc.* (9th Cir. 1988) 853 F.2d 700.

The horizontal dimension test meanwhile involves a comparison of the debtor's business to other businesses in the same industry. In essence, this test considers whether other, similar, or similarly-situated businesses engage in similar credit transactions as a matter of day-to-day operations. *In re Dant & Russell, Inc*., supra, 853 F.2d at 705. If they do, then that supports an ordinary course finding. The horizontal dimension test adds objectivity to the inquiry. The test effectively gauges whether either the creditor or debtor has done something untoward in order to gain an advantage over the other creditors. *In re Azevedo* (Bankr. D. Idaho 2013) 485 B.R. 596, 602.

Section 364(a) gives the priority of an administrative expense to persons who extend credit to the trustee or debtor in possession in the ordinary course of business, without any need for notice or a hearing in advance of the credit extension. Approval for such financing is not required here as the Debtor has regularly used debt financing to pay operating expenses, including payroll. Dreicer Decl. at ¶ 14. As a start-up with a complex and technologically

distinct product and business model, the Debtor has previously used credit facilities and extensions of credit to pay for expenses over extended periods of time. *Id.* As in the past, the extension of credit at issue here within the ordinary course business. *Id.*

The Debtor is a start-up and its operating finances should be viewed alongside other software start-ups. This makes the situation clearly distinguishable from cases such as *In re Massetti* (Bankr. E.D. PA 1989) 95 B.R. 360, where the debtor was unable to establish that credit was regularly extended to cover operating expenses. The Debtor's schedules and its operating history clearly indicates a record demonstrating that extensions of credit are used regularly for the payment of operating expenses, including payroll. (Dkt. No. 26, Schedule E/F) The lifeblood of a technology start-up is Angel and venture capital funding, which is true for the Debtor as well. Accordingly, there is no genuine dispute that such funds have been used in the day-to-day operations of the Debtor, such that use of these funds in no way indicates an attempt to gain an advantage over certain creditors. The Court should therefore determine that the post-petition financing at issue is in the ordinary course of business and no express authorization is required for the financing to be treated as an administrative expense pursuant § 364(a).

Debtor has customarily borrowed funds to meet its payroll and operating expenses, making such financing clearly within the ordinary course of business. The start-up nature of the Debtor and its history of debt and equity funding as the means of building its business model warrants such a determination. For example,

1. Debtor had an unsecured line of credit from Shareholder Welborn family trust which was borrowed in amounts ranging from $75,000 to $400,000, and which payments were made of $75,000 to $175,000 at a time.
2. Debtor obtained unsecured loans from Director and Shareholder, John Evey, of $150,000 and $20,000.
3. Keshif provided unsecured loans to Debtor on several occasions, the latest of which was in April/May of 2016 for $250,000-$500,000.

4. Ms. Dreicer has personally loaned Debtor funds several times to pay critical expenses.

Dreicer Decl. at ¶ 12.

### 2. The proposed extension of credit is within the ordinary course of business and intended to assist Debtor in generating the revenue needed for a successful reorganization

Keshif asserts that the $500,000 is money the Debtor does not have and would not be in the "ordinary course." However, Debtor has obtained $500,000 in unsecured Debtor-In-Possession ("DIP") financing through its fundraising efforts from the Capdevilla Family Trust Dated 6/25/1996 ("Capdevilla"). Dreicer Decl. at ¶ 15 and Exh. A. The Capdevilla note was a loan made in the ordinary course of business to be paid as an administrative expense with secondary priority. *Id.* The lender, knowing of the bankruptcy, has specifically extended the credit in reliance upon Section 364(a) as an ordinary-course transaction. Moreover, the debt at issue is meant to fund an expense that is otherwise eligible for treatment as an administrative expense under section 503(b). That is to say, the credit here is being extended to fund an expense that is not allowable under section 502(f) and is fundamentally an "actual, necessary cost [or] expense of preserving the estate" for the benefit of all creditors. 11 U.S.C. § 502.

Numerous customers and creditors depend upon the Debtor's continued operations so it can further develop its product with the goal of eventually making money, including through the performance of its existing contract, which is estimated to be worth $25,000,000. The Debtor has clearly established that at all times it met its payroll through loans and lines of credit, as well as paid-in capital. It relied upon the line of credit debt purchased by Keshif Ventures, LLC as well as more than a $1,000,000 in other loans or credit facilities as shown in the Debtor's schedules. (Dkt. No. 26) That is how the Debtor has operated since its inception in 2013, and such financing was certainly within the expectations of all of the existing creditors of the Debtor because it this consistent with the Debtor's financing throughout its development.

Immediately pre-petition, Debtor was being funded by its management and staff. Dreicer Decl. at ¶17. The $500,000 unsecured DIP facility is now a funding option. *Id.* Therefore, even though a secured DIP facility has yet to be approved, there is $500,000 of unsecured financing that can support some of the payroll payments and continuing operations. *Id.* at ¶ 15. Those funds are available to Debtor as soon as the Court approves its Motion for payment of non-insider payroll. *Id.* at ¶ 16.

As stated previously, Debtor has also obtained a commitment from Capdivella of $1,000,000 in secured post-petition DIP financing, which Debtor will have immediate access to once the to-be filed motion regarding that financing is approved. *Id.* at ¶ 18. Such extension of credit by individuals and institutions have been a regular part of Debtor's operations since inception. *Id.* at ¶ 14. Debtor intends to use the funds from Capdevilla, and the later secured post-petition DIP financing, over the next twelve months in accordance with its recovery plan and its proposed budget. *Id.* at ¶ 19 and Exhibit B thereto. Once the Court grants approval of the $1,500,000 in DIP financing, Debtor would apply those funds to cover continued business operations and debt payments over time. *Id.* Furthermore, Debtor needs to certify the resolution of employee issues to Customer in order to bring about the $3,000,000 payments that are critical to Debtor's recovery budget. *Id.* at ¶ 21.

### 3. Debtor will properly use the funds if its motion is granted.

The Debtor believes that its employees rely heavily on their periodic paychecks to pay their household expenses and that these employees will suffer significant harm if the Debtor cannot pay their wages promptly. Dreicer Decl. at ¶ 26. Debtor intends to use the funds from Capdevilla, and the later secured post-petition DIP financing, over the next twelve months in accordance with its recovery plan and its proposed budget. *Id.* at ¶19. The funds will be used to shore up the Debtor's finances in light of the effect the Demand Loan has had on fundraising, and the funding will pay for months of operations. *See* Exhibit B to Dreicer Decl. filed herewith, which details the Debtor's expenses, and toward the satisfaction of which the $500,000.00 would contribute in addition to the payment of non-insider payroll. Those expenses include all the costs of running a business, such as office expenses, rent, utilities,

legal fees, payroll and taxes thereon, as well as ongoing product development of the Debtor's SaaS. *See* Exhibit B to Dreicer Decl.

Indeed, although Debtor intends to secure additional DIP financing, as it has done numerous times in the past to fund operations, the current unsecured financing will enable it to continue its ongoing business operations for more than three months. Dreicer Decl. at ¶ 22. In that time, employees necessary to Debtor's ongoing business operations can be retained, can participate in knowledge transfer essential to continued operations, so as to enable Debtor to retain its largest customer. *Id.* In addition, Debtor can complete settlements with former employees to enable it to certify that employee issues have been resolved to Customer's satisfaction. *Id.* If Debtor is not authorized to obtain this financing and pay the payroll obligations that it has accrued pre-petition, employees who are necessary to Debtor's organizational recovery will likely cease working upon expiration of their contracts. *Id.* at ¶ 23. If the Debtor loses its employees, its continued operations will be seriously impaired, its reorganization will be jeopardized, and the Debtor, the estate, and the Debtor's creditors, would most likely suffer irreparable injury as a result. *Id.* at ¶ 25.

In addition, in order to meet its obligation under the Agreement so as to be entitled to the payments set forth therein, Debtor must continue its operations. Dreicer Decl. at ¶ 24. Further, Debtor must certify that employment issues have been resolved. *Id.* ¶ 21. If Debtor fails to do so, it is extremely likely that the Master Subscription and Collaboration Agreement will fail, eliminating Debtor's prospects for immediate reorganization. If this Customer is lost, significant revenue to Debtor be lost along with it, severely hampering Debtor's ability to recover. *Id.* at ¶ 25.

**B.  <u>The Court should grant the requested relief.</u>**

To preserve its business operations and to achieve a successful reorganization, the Debtor must have the ability to pay the entirety of its pre-petition payroll in the ordinary course of business, but not in excess of such creditors' priority claims. Retaining the Debtor's employees is essential to maintaining its operations. The services the Debtor's employees provide are directly related to all of the revenues generated by the Debtor's business on an

ongoing basis. Under the circumstances of this case, Bankruptcy Code §105(a) alone provides sufficient basis for obtaining the financing on an administrative basis under 11 U.S.C. § 364 to ensure payment of pre-petition wages and benefits as requested in the Emergency Motion. Immediate authorization to pay its Pre-Petition non-insider payroll is required to keep the Debtor's business viable and is in the best interests of the Debtor, the estate, and all creditors in general. The Debtor has no issues of cash collateral at this time, as the funding is coming from post-petition DIP financing which will not be subject to a pre-petition security interest. In addition, the employees to be paid from these funds, *see* the Declaration of Elizabeth Dreicer filed on January 4, 2017 with Debtor's Emergency Motion at Exhibits A and B, will receive an amount less than or equal to the amount established as a priority claim under §507(a)(4)(A). In this instance the Debtor will pay pre-petition wages which do not exceed the amount such employee would otherwise be entitled to receive under a priority claim even if they are owed more than this amount.

Therefore, Debtor has sufficiently established grounds for the relief it has requested on an emergency basis, to wit: that the Debtor urgently needs the financing to pay its non-insider employees to enable it to continue its operations, and to enable it to certify that all employee issues have been resolved so as not to lose its largest customer.

C. **If the Court determines that the DIP financing is not in the ordinary course of business, relief is otherwise appropriate under section 364(b).**

Section 364(b) applies when Section 364(a) does not. Under 364(b), a DIP still may obtain credit outside of the ordinary course of business, but procedural safeguards are imposed. In such a situation, the Bankruptcy Court has the discretion to authorize the unsecured obligation "after notice and a hearing." 11 U.S.C. § 102(1) provides that the term "after notice and a hearing" may not always require an actual hearing. Specifically, a hearing is not required if proper notice is given, or if there is insufficient time for a hearing, and the court authorizes the incurring of debt. Section 102(1)(B)(i) and (ii).

There are two elements that must be met in order for relief under Section 364(b) to apply. Specifically, the court must find the creditor's transactions: (1) were with the

16

SUPPLEMENTAL MEMORANDUM OF POINTS AND AUTHORITIES ISO EMERGENCY/FIRST DAY
MOTION FOR AN ORDER AUTHORIZING DEBTOR TO PAY PRE-PETITION NON-INSIDER PAYROLL

bankruptcy estate; and (2) directly and substantially benefitted the estate. In re Azevedo (Bankr. D ID 2013) 485 BR 596, 602. Unlike loans under Section 364(a), loans made to the DIP under Section 364(b) are not conditioned upon operation of the business. See 11 USC § 364(b). In this case, the unsecured loan will be with the bankruptcy estate pursuant to the unambiguous terms of the note, and, in allowing the Debtor to pay wages to its non-insider employees, will directly and substantially benefit the bankruptcy estate and all of its creditors. Accordingly, the proposed financing meets the standards for authorization under Section 364(b) and the Debtor respectfully requests that the Court grant relief to the Debtor to obtain the funds and treat them as an administrative expense.

## CONCLUSION

Debtor respectfully requests that the Court enter an order authorizing the post-petition payment of pre-petition, non-insider compensation to Debtor's employees. The Debtor has obtained DIP financing in the ordinary course of running its business and such financing – which will fund wages and other operating expenses – is entitled to implicit authorization under 11 U.S.C. § 364(a). However, if the Court determinations that the extension of credit is not in the ordinary course of business for the Debtor, it is respectfully requested that the Court enter an order authorization of the financing under 11 U.S.C. § 364(b). Under both analyses, the financing is essential to the ongoing operations of the Debtor, and to allow it time to reorganize. The Court is authorized to approve the unsecured tranche of the credit extension as an administrative expense on an emergency basis, and the Debtor requests entry of such an order.

Dated: January 11, 2017        /s/ John L. Smaha
                               John L. Smaha
                               SMAHA LAW GROUP, APC.
                               *Proposed Attorneys for Debtor, Posiba, Inc.*